UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| NANCY SINGLETON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 3:15-CV-00397-MGG |
| ) | |
| COMMISSIONER OF SOCIAL ) | |
| SECURITY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Nancy Singleton ("Singleton") filed her complaint in this Court seeking reversal and remand of the Social Security Commissioner's final decision to deny her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title XVI of the Social Security Act. For the reasons discussed below, this Court reverses and remands the Commissioner's final decision.

**I.   PROCEDURE**

Singleton filed claims for DIB and SSI on March 24 and 26, 2012, alleging disability beginning March 29, 2011. The Social Security Administration ("SSA") denied Singleton's application initially on June 28, 2012, and upon reconsideration on December 28, 2012. On November 8, 2013, a hearing was held before an administrative law judge ("ALJ") where Singleton and an impartial vocational expert appeared and testified. The ALJ denied Singleton's claims on March 17, 2014, at Step Two of the evaluation process finding that Singleton was not disabled because her impairments were not severe. On July 8, 2015, the Appeals Council denied

Singleton's request for review, making the ALJ's decision the final decision of the Commissioner.

On September 3, 2015, Singleton filed a complaint in this Court seeking remand of the Commissioner's decision. On January 18, 2016, Singleton filed her opening brief. Thereafter, on April 21, 2016, the Commissioner filed a responsive memorandum asking the Court to affirm the decision denying Singleton benefits. Singleton filed her reply brief on May 5, 2016. The Court may enter a ruling in this matter based on the parties' consent pursuant to 42 U.S.C. § 405(g) and 28 U.S.C. § 636(c)(1).

## II.    RELEVANT BACKGROUND

### A.    Plaintiff's Testimony

Singleton was 53 years old, at the time of filing for disability. She has a high school education and a strong work history having reported earnings every quarter between 1978 and the alleged onset date in 2011. She last worked as a supervisor in a photo finishing department at a major drugstore chain, and was fired for illness-related absences.

As part of her disability application, Singleton completed a Function Report on March 27, 2012, a disability report on April 17, 2012, and a second disability report on February 19, 2013. In these reports, Singleton alleged that she suffers from physical impairments including migraines, a bleeding ulcer, back and knee pain, depression, and leg weakness. She testified that she suffers from fibromyalgia, that she is in constant pain at a level "7" or "8", especially in her entire back and legs, and that her medications, Neurontin and Tramadol, only help her a little. She also asserted that she has balance problems, that she is often dizzy, that she has fallen down twice, that she is not able to bend for more than 15 seconds at a time, that she has difficulty seeing because she does not have bifocals, that she is able to walk just one block at a time, that

2

she is able to stand for just 15 minutes at a time, that she is able to sit for just 45 minutes at a time, and that she is able to lift just 5 pounds.

She added that she has difficulty pushing and pulling, that she has trouble reaching out and overhead, that 2 fingers on her left hand are numb so she has difficulty gripping objects, that she has trouble climbing stairs, that she uses a special bar to get into and out of the shower, that she takes frequent breaks while doing household chores, and that she lies down 4 or 5 times during the day. She stated that she takes Sumatriptan for her migraines, which occur 3 or 4 times per week and lasting 30 minutes to several hours. She reported that she used a walker at home about once a week, and that she has been using a cane for a couple of years.

Singleton also referenced mental impairments when she stated that she cannot work around loud and repetitive noises due to stress and depression, that it takes her forever to move from one place to another due to depression, that she is not able to follow a story line in books or on television, and that she has crying spells every other day which last for 30 minutes.

In a Third-Party Function Report dated May 23, 2012, Singleton's sister, Patricia Angel, stated Singleton was unsteady on her feet, that she was depressed, and that she often did not follow advice from her family, friends, or doctors. Angel also alleged that Singleton no longer participated in family get-togethers, that she was only able to lift light objects, that she suffered from dizzy spells, that she used a walker, that she did not handle stress like she used to, that she was unsociable, and that she had difficulty bending and climbing stairs.

### B. Medical Evidence

#### 1. Singleton's Medical Treatment History

Singleton's medical record before the Court begins in March 2010, about one year before her alleged onset date and while she was still working. At that time, Singleton sought treatment

through the Lutheran Medical Group for hypertension and migraines. In the summer of 2010, Singleton experienced regular vomiting that ultimately led to surgical removal of her gall bladder. Despite the surgery, however, Singleton continued to suffer from vomiting and other gastric issues into January 2011.

In June 2011, Singleton was admitted to the hospital with ongoing gastric issues plus hypertension and depression. At that time, she refused a referral to a behavioral health professional. She continued treatment without much success through August 2011. In September 2011, she was diagnosed with neuropathy and in October 2011, she was admitted to the hospital for a second time for alcoholic hepatitis and major depression. Singleton was also seen in mid-October 2011 for issues related to falls, pain, and needing a walker to ambulate. In December 2011, she was hospitalized for the third time for hypotension[1] and dehydration during which time she once again declined a referral to a behavioral health professional.

The record suggests that financial concerns limited Singleton's medical treatments throughout this time. However, the record includes no opinions about Singleton's ability to work from any of the medical professionals she saw from 2010 through July 2012 at the Lutheran Medical Group before she started treating at HOPE 85, a free clinic where she saw Dr. Rose Wenrich. Through 2013, Singleton visited HOPE 85 and Dr. Wenrich for treatment of many of the same symptoms, but also for a wide range of symptoms including a new diagnosis of fibromyalgia as well as depression.

---

[1] Despite Singleton's past history of hypertension, her discharge summary for her December 2011 hospitalization, prepared by her attending and primary care physician, Dr. Sanjay J. Patel, states that one of her admitting diagnoses was hypotension. [DE 10 at 328].

4

On August 13, 2013, Singleton was admitted to the Bowen Center for a 72-hour emergency detention after attempting suicide by overdosing on pills. When she arrived at the Bowen Center, Singleton was assessed with a Global Assessment of Function ("GAF") score of 20-25[2]. During a psychiatric evaluation while she was detained, Singleton stated that "she did not want to go on any more and be homeless . . . ." [DE 10 at 450]. She reported that she had been on antidepressants for a year prescribed by a free clinic. Reports on discharge, however, show that Singleton appeared cooperative, made good eye contact, and denied being suicidal or homicidal. In addition, her discharge report indicated that her mood was better, her affect was appropriate, her stream of thought was linear and goal directed, her insight was limited to fair, and her GAF score had improved to 50[3].

Before Singleton's emergency detention, her primary care physician, Dr. Wenrich, completed a Medical Source Statement Concerning the Nature and Severity of an Individual's Physical Impairment on July 11, 2013. In her Statement, Dr. Wenrich opined about Singleton based on having treated her at HOPE 85 for a year. Dr. Wenrich's Statement detailed Singleton's diagnoses of fibromyalgia, tachycardia, migraines, depression, chronic pain, ulcers, insomnia, hypothyroidism, and low vitamin D with a "poor" prognosis. Dr. Wenrich also opined that Singleton's primary symptoms were pain in her back, legs and arms, which resulted in an inability to stand for more than 30 or 40 minutes. Dr. Wenrich stated that Singleton's headaches

---

[2] A GAF score measures a clinician's subjective judgment of an individual's psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed., 2000) (DSM-IV-TR). The higher the score, the higher the level of functioning. *Id.* A GAF score of 21 to 30 is defined as "Behavior [] considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas (*e.g.*, stays in bed all day, no job, home, or friends). DSM-IVR, p. 34.

[3] A GAF score of 41 to 50 indicates serious symptoms and a score of 51 to 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id*. at 34.

were another of her primary symptoms. She detailed that Singleton has deep muscle pain with severe head pain and that she cannot bend over for more than 15 seconds because she becomes light-headed. She opined that Singleton experiences fatigue at a level of 9 out of 10, and that her pain has not been resolved with medication without unacceptable side effects.

Dr. Wenrich also opined that Singleton would be limited to 2 or less hours of sitting and standing/walking in a workday on a sustained basis, and that it would be necessary for Singleton to avoid sitting continuously in a work setting. Dr. Wenrich further opined that Singleton was limited to rarely carrying less than 10 pounds and never carrying more than 10 pounds, and that she had significant limitations doing repetitive reaching, handling, fingering and lifting due to numbness in her left hand. In addition, Dr. Wenrich reported that Singleton required the use of a cane or another assistive device to stand/walk and that her poor balance would interfere with her ability to keep her neck in a constant position. She opined that Singleton's impairments lasted and could be expected to last at least 12 months, that she could not do a full time competitive job that requires activity on a sustained basis, and that she had further limitations including psychological limitations, limited vision, inability to stoop, push, kneel, pull, and bend, and the need to avoid heights.

Dr. Wenrich detailed that Singleton was taking numerous medications for her impairments, that emotional factors contributed to the severity of her symptoms, and that she could only tolerate low-stress work. Dr. Wenrich explicitly found that Singleton is not a malingerer, noting that "[w]hen she was well, enjoyed challenging workplace – now physically unable to work." [*Id.* at 399]. Dr. Wenrich opined that Singleton's impairments would cause her to be absent from work more than 3 times per month.

### 2.     State Agency Examinations and Reviews

As part of her disability application process, Singleton underwent a physical consultative examination by Dr. Schvon Cummings, M.D., on June 5, 2012. On June 6, 2012, Dr. Frank Choate, Psy.D. performed a psychological consultative examination of Singleton.

Reporting on the physical examination, Dr. Cummings stated that Singleton reported symptoms including left hand numbness, balance issues, dizziness, and vomiting. Dr. Cummings also noted Singleton's diagnoses including cholecystectomy, a history of peptic ulcers, knee replacement surgery, and hypertension. Dr. Cummings's examination revealed mostly normal results including a statement that "[c]linical evidence does not support the need for an ambulatory aid." [*Id.* at 369]. However, Dr. Cummings explicitly noted decreased sensation in Singleton's left 4th and 5th digits. Dr. Cummings diagnosed Singleton with emesis (vomiting) of unknown etiology, left hand numbness of unknown etiology, hypertension, history of peptic ulcer disease, and joint pains likely secondary to degenerative changes.

Dr. Choate's psychological exam included a clinical interview, mental status examination, and a record review. Dr. Choate opined, based on his observations, that Singleton has signs of depression and anxiety, noting that "[s]he has been feeling this way for a couple of years, and sometimes felt depressed while she was still working." [*Id.* at 374]. He stated that Singleton's "affect was flat during the assessment process[, that] her mood bordered on angry[, and that s]he was evasive with many of her answers." [*Id.* at 375]. Dr. Choate opined that Singleton's concentration, persistence and pacing during the interview were "limited", and that her insight into her behavior and consequences of that behavior were "poor." [*Id.*]

Dr. Choate also opined that "[Singleton's] attempts at the tasks appeared to represent an accurate appraisal of her functioning." [*Id.*] He reported that Singleton was unable to complete

7

Serial 7's from 100 and Serial 3's from 30 and noted that he "had to repeat the instructions at least three times." [*Id.*]  He also administered Rey's 15-Item Memory Test, which is designed to help detect faking or exaggeration of memory complaints.  He noted that Singleton was able to recall 8 of 15 items compared to typical results where individuals recall thirteen or more items. [*Id.* at 376].  He found that Singleton was "moderately cooperative" and that "her ability to interact with this examiner was poor." [*Id.*]  He opined that Singleton "needs some support from others to accomplish her daily tasks," which "appear to be simple [and that h]er ability to sustain these efforts on a daily basis appears to be impaired." [*Id.*]  He said that Singleton "was attentive to the tasks requested of her and seemed to put forth a good effort[, but that s]he seemed confused when asked the regular questions of the evaluation," as evidenced by her somewhat disconnected responses to questions about her friends and what time of day she arose for the day. [*Id.* at 375].

Dr. Choate concluded that Singleton had major depressive disorder that was recurrent, severe, without psychotic features, and he noted numerous psychosocial and environmental problems, including problems with a primary support group, social environment, occupation, finances, and access to health care services (no health insurance).  Dr. Choate gave Singleton a GAF score of 55 and found that 55 was her highest score in the past year.

Upon review of Singleton's record, State Agency experts M. Brill, M.D. and Donna Unversaw, Ph.D. in June 2012 and Joseph A. Pressner, Ph.D., and M. Ruiz, M.D. in December 2012 completed case analyses, all of which concluded that her condition was not severe. Nevertheless, they did find that she had emesis, nausea, dizziness, major depressive disorder, mild restrictions on daily living, and difficulties in social function, concentration, persistence, or pace.  [*Id.* at 378, 382, 389, 393–94].

### C.     The ALJ's Determination

After the hearing on November 5, 2013, the ALJ issued a written decision reflecting the following findings based on the five-step disability evaluation prescribed in the SSA's regulations.[4]  At Step One, the ALJ found that Singleton had not engaged in substantial gainful activity since March 29, 2011, the alleged onset date.  At Step Two, the ALJ found that Singleton did not have any severe impairments.  Without proceeding to Steps Three through Five, the ALJ found that Singleton was not disabled and denied her benefits.

In her decision, the ALJ found that Singleton's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but she found that Singleton and her sister's claims about the intensity, persistence, and limiting effects of the symptoms were not entirely credible.  In support, the ALJ cited to Singleton's Function Report, the Field Office's Disability Report, Singleton's sister's Third Party Function Report, and the Field Office's Disability Report on Appeal , and noted that Singleton

> lives alone . . . she is able to drive, care for her cats (sometimes with some help from friends or family members), take her medications without reminders, go out alone sometimes, pay bills, count change, handle bank accounts, use a telephone, spend time with her friends, go to church at least somewhat regularly, care for her personal needs independently, prepare at least simple meals, and do household chores (with breaks).

[DE 10 at 30].  However, the ALJ also noted that Singleton conceded that her walker and cane were not physician prescribed.  The ALJ also discounted Singleton's testimony based upon her decision not to seek outpatient mental health treatment until August 2013.  The ALJ also found that Singleton's credibility was "somewhat undermined by the allegations that [one of] her

---

[4] *See* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v).  The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001); *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

9

former primary care physician[s], Dr. Patel, was lying about her." [DE 10 at 30].  Finally, the ALJ concluded that Singleton's score of 8 on the 15-Item Rey Memory Test suggested that she may have been exaggerating.

In analyzing the medical evidence, the ALJ dismissed Dr. Choate's finding of a GAF score of 55, as she considered it a mere snap shot of Singleton's life and that it includes factors irrelevant to any disability assessment.  The ALJ also assigned little weight to the opinion of Singleton's treating physician, Dr. Wenrich, explaining that she had not been trained to evaluate disability for social security purposes, unlike the state doctors, and that her progress notes regarding Singleton's symptoms were inconsistent with those reported in her opinion.  Specifically, the ALJ was persuaded by evidence that Singleton's symptoms were largely within normal limits, except for high blood pressure at times, abdominal tenderness, and mild obesity, with a body mass index of approximately 30.  Moreover, the ALJ relied upon Dr. Wenrich's medical chart for Singleton in concluding that Singleton was generally alert and cooperative and that she usually exhibited coherent speech and normal concentration and attention.

Based on these findings, the ALJ determined in her March 17, 2014, decision that Singleton did not have any severe impairments and therefore had not been under a disability from March 29, 2011.  Singleton requested that the Appeals Council review the ALJ's decision, and on July 8, 2015, the Council denied review, making it the Commissioner's final decision.  *See Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005); 20 C.F.R. § 416.1481.

## III.   ANALYSIS

### A.   Standard of Review

On judicial review, under the Social Security Act, the Court must accept that the Commissioner's factual findings are conclusive if supported by substantial evidence. 42 U.S.C. §

405(g); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, substantial evidence is simply "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

A court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Thus, the question upon judicial review is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). In other words, even if substantial evidence would also support an opposite conclusion, the Commissioner's decision must be upheld. *See Arkansas v. Oklahoma*, 503 U.S. 91, 112–13 (1992); *Farrell v. Sullivan*, 878 F.2d 985, 990 (7th Cir. 1989).

Minimally, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). However, the ALJ need not specifically address every piece of evidence in the record, but must present a "logical bridge" from the evidence to his conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618

11

(7th Cir. 2010). The ALJ must provide a glimpse into the reasoning behind his analysis and the decision to deny benefits. *Zurawski*, 245 F.3d at 889.

**B.     Issues for Review**

Through this action, Singleton challenges whether the ALJ properly dismissed Singleton's claim at Step Two when she found that none of her impairments or any combination of them were severe. In support, Singleton contends that the ALJ improperly discounted her testimony about her symptoms and limitations and that the ALJ improperly discounted the medical opinions of her treating physician, Dr. Wenrich, and the two consultative examiners, Dr. Cummings and Dr. Choate. The Commissioner, on the other hand, argues that the ALJ's decision is supported by substantial evidence as evidenced by the ALJ's discussion of the medical evidence and Singleton's alleged symptoms.

It has long been established that the standard at Step Two of the Agency's sequential evaluation process is a "*de minimis*" one, designed to screen out only the most minor of impairments. *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987); *Johnson v. Sullivan,* 922 F.2d 346, 347 (7th Cir. 1990). Pursuant to SSR 96-3p, an impairment can be considered "not severe" only if it is a slight abnormality, or combination of slight abnormalities, that it has no more than a minimal effect on the individual's ability to do basic work activities regardless of age, education, or work experience. *See also* 20 C.F.R. § 404.1522(a); *Bowen*, 482 U.S. at 153-54; *Johnson*, 922 F.2d at 347. In particular, SSR 96-3p states:

> if, after completing development and considering all of the evidence, the adjudicator is unable to determine clearly the effect of an impairment(s) on the individual's ability to do basic work activities, the adjudicator must continue to follow the sequential evaluation process until a determination or decision about disability can be reached.

*See also* SSR 85-28. In light of this authority, Singleton argues that her impairments, or the combination thereof, satisfy the *de minimis* standard for severity at Step Two such that the ALJ should have proceeded through the remaining steps of the disability analysis before determining whether or not she is disabled and entitled to benefits.

### C. The ALJ Failed to Articulate a Logical Bridge for Discounting Singleton's Testimony

In her analysis of the severity of Singleton's impairments, the ALJ discounted Singleton's testimony regarding her symptoms. Specifically, the ALJ focused on Singleton's ability to perform household tasks to show that she is capable of more than she suggests. However, Singleton contends that the ALJ failed to demonstrate consideration for the full range of Singleton's testimony about her ability to perform activities of daily living. In addition, Singleton challenges the ALJ's reliance upon her lack of mental health treatment to support her conclusion arguing that the ALJ omitted extenuating circumstances that should have been considered from her analysis.

#### 1. The ALJ's Evaluation of Singleton's Household Chores Was Incomplete

The ALJ discounted Singleton's testimony about her impairments in part based on her claims of being able to perform some household chores. Singleton argues that the ALJ misrepresented Singleton's testimony. In other words, Singleton asserts that the ALJ did not articulate why Singleton's explanatory and qualifying testimony about completing her household chores was irrelevant. Singleton also alleges that the ALJ failed to apply Seventh Circuit legal standards related to evaluation of a claimant's testimony.

For instance, the Seventh Circuit has held that the ability to perform basic household chores, particularly when done with breaks, cannot be counted against an applicant. *Clifford v.*

13

*Apfel*, 227 F.3d 863, 872 (7th Cir. 2000), *as amended* (Dec. 13, 2000) ("minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"). "[A] person's ability to perform daily activities, especially if they can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).

Singleton is a case in point. As referenced above, the ALJ summarized Singleton's testimony about her daily activities as follows:

> [she] lives alone . . . she is able to drive, care for her cats (sometimes with some help from friends or family members), take her medications without reminders, go out alone sometimes, pay bills, count change, handle bank accounts, use a telephone, spend time with her friends, go to church at least somewhat regularly, care for her personal needs independently, prepare at least simple meals, and do household chores (with breaks).

[DE 10 at 30]. Indeed, Singleton concedes that she does do many of these things, but contends that the ALJ failed to acknowledge the extent of assistance that she needs to accomplish these tasks. For instance, Singleton reported in her Function Report that she dressed while sitting on her bed, that she was sometimes too weak to get into the shower even with the help of a special bar, that she only prepared very simple meals, that she used a special raised toilet, that she did laundry with the use of a walker and breaks, and that sometimes a friend did her dishes. [DE 10 at 172–73]. Moreover, Singleton said that when she went outside it was generally to see a doctor. She went to the store if she had help, but mainly someone went for her. She said it depended on her condition whether she could drive. [*Id.* at 174]. She spent time with others by talking on the phone. She reported going to church with a friend's help about a month before. [*Id.* at 175]. Notably, Singleton's brief also references the opinion of consultative psychological examiner, Dr. Choate, who noted that Singleton needs some support to accomplish

14

even her simple daily tasks and that "[h]er ability to sustain these efforts on a daily basis appears to be impaired." [*Id.* at 374–75].

In this context, Singleton argues that the ALJ's consideration of her limitations in activities of daily living is not consistent with the ALJ's conclusion that she has no more than minimal impairments such that they are not severe. Yet, the Commissioner argues that the ALJ reasonably evaluated Singleton's symptoms and limitations as compared to objective medical evidence. As such, the Commissioner contends that the ALJ's decision finding Singleton's alleged symptoms overstated, or discounting her credibility, was supported with substantial evidence and cannot be considered patently wrong. "So long as an ALJ gives specific reasons supported by the record, [the court] will not overturn [an ALJ's] credibility determination unless it is patently wrong." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015).

Despite her arguments to the contrary, Singleton has not demonstrated that the ALJ's credibility determination was patently wrong. Singleton has, however, brought into question whether the ALJ ignored evidence when deciding how to assess her ability to perform activities of daily living. Such "cherry-picking," or failing to mention directly relevant or even contradictory evidence, by the ALJ is not proper. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *see also Huber v. Astrue*, 395 F. App'x 299, 302 (7th Cir. 2010) (citing *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984)). As such, the ALJ's apparent plucking of isolated statements from Singleton to discredit her, without accounting for the context and qualifications of the statements, fails to create a logical bridge to the ALJ's conclusions about Singleton's symptoms.

15

### 2. The ALJ's Analysis of Singleton's Lack of Mental Health Treatment Omitted Extenuating Circumstances

In support of the ALJ's decision, the Commissioner points out that Singleton only sought treatment for her mental health well after she complained of problems and that she in fact refused treatment at times. The Commissioner contends that Singleton's delayed or refused treatment justified the ALJ's decision to discount Singleton's testimony. The Commissioner cites *Coleman v. Astrue*, 269 F. App'x 596, 603 (7th Cir. 2008), which held that an ALJ has "solid grounds" for not believing a claimant's statements regarding the limiting effects of pain where the claimant fails without legitimate excuse to comply with treatment. However, an ALJ should not discredit a claimant for failure to seek treatment if the claimant lacks insurance and cannot pay for care. *Stahl v. Colvin*, 632 Fed. App'x 853, 860 (7th Cir. 2015).

Here, the record shows that Singleton did not pursue treatment because she lacked insurance and could not pay for care and that her care was largely limited to hospitalizations and treatment at the free clinic, HOPE 85. [DE 15 at 8 (citing DE 10 at 352, 376, 469)]. By failing to mention Singleton's financial plight when holding her failure to seek treatment against her, the ALJ discounted Singleton's testimony improperly.

### D. The ALJ Improperly Discredited Singleton's Examining Physicians

In addition to insufficiently analyzing the credibility of Singleton's testimony, the ALJ improperly discounted the opinions of the Agency's examining physicians, Doctors Choate and Cummings, which contrary to the Commissioner's arguments, received very little discussion. Moreover, the ALJ failed to explain why she relied more heavily upon the opinions of non-examining, reviewing Agency physicians rather than on Dr. Choate's and Dr. Cummings's opinions, which were based on examinations of Singleton. Under Social Security regulations, ALJs should give more weight to the medical opinion of a source who examines a claimant than

to the medical opinion of a source who has not examined the claimant. 20 C.F.R. § 404.1527(c)(1). And in this case, the non-examining, reviewing Agency physicians reviewed Singleton's records before much of her treatment at HOPE 85 in 2013, including her emergency detention following her suicide attempt. Yet still, the ALJ dismissed the bulk of Dr. Choate's opinion and all of Dr. Cummings's opinion in favor of the contrary non-examining opinions without explanation.

More specifically, the ALJ dismissed the relevance of Dr. Choate's opinion based on his assignment of a GAF score of 55 to Singleton. The ALJ also concluded that Singleton's score indicated that she was exaggerating, yet Dr. Choate merely reported that Singleton only recalled 8 without further commentary. Singleton also cites multiple examples showing the broader scope of Dr. Choate opinion arguing that the ALJ failed to account for this evidence that her impairments caused more than a minimal effect on her ability to work. For instance, Singleton cites to Dr. Choate's observations that she has signs of depression and anxiety, noting that "[s]he has been feeling this way for a couple of years, and sometimes felt depressed while she was still working." [DE 10 at 374-75]. Singleton also suggests that the ALJ ignored Dr. Choate's opinion regarding her flat affect, her angry mood, her evasive responses, her limited concentration, persistence, and pace, and her poor insight into her own behavior and the consequence of that behavior. *Id.* Singleton further challenges the ALJ's failure to consider her poor performance on the Serial 7's and Serial 3's tests, her need for repeated instructions during testing, and her poor interaction with Dr. Choate. [DE 10 at 375-76]. Singleton also notes Dr. Choate's conclusions that Singleton had major depressive disorder that was recurrent, severe, without psychotic features, and noted numerous psychosocial and environmental problems, including problems

17

with a primary support group, social environment, occupation, finances, and access to health care services (no health insurance). *Id.*

Additionally, the ALJ gave even less consideration of the opinion of the other agency examiner, Dr. Cummings. The ALJ only references Dr. Cummings's opinion regarding Singleton's physical impairments by exhibit number. While Dr. Cummings's report does not present as bleak of an outlook on Singleton's condition as she portrays in her briefs here, Singleton does note that Dr. Cummings stated that Singleton reported symptoms including left hand numbness, balance issues, dizziness and vomiting and that Singleton had diagnoses including cholecystectomy, a history of peptic ulcers, knee replacement surgery, and hypertension. Singleton also points to Dr. Cummings's notes that his examination revealed decreased sensation in her left 4th and 5th digits and joint pains likely secondary to degenerative changes—none of which were referenced in the ALJ's decision.

Singleton is also dissatisfied with the ALJ giving only little weight to the opinion of Dr. Wenrich, her treating physician at HOPE 85. Treating physician opinions are generally preferred to those of non-treating sources because treating physicians are likely able to provide a longitudinal picture of a claimant's impairments. 20 C.F.R. § 404.1527(c)(2). As such, treating source opinions can only be rejected for good cause and if a treating source's opinion is not given controlling weight, the ALJ must articulate a rationale for the weight given. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)).

Despite Singleton's protestations to the contrary, the ALJ recognized Dr. Wenrich's status as a treating physician when she introduced Dr. Wenrich as "a primary care physician at 85 Hope Clinic, a free/low-cost clinic where the claimant has received medical treatment since 2012." [DE 10 at 30]. Moreover, the ALJ explained how Dr. Wenrich's opinions about

18

Singleton's limitations for work were inconsistent with her own progress notes showing normal results amidst her impairments. Inconsistency with the objective medical evidence in the record may be an acceptable rationale for discounting a medical opinion. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Nevertheless, the ALJ did not clearly articulate her rationale for prioritizing the opinions of the non-examining, reviewing Agency physicians over those of Dr. Wenrich, Dr. Choate, and Dr. Cummings. Without such an explanation, the ALJ has not supported her conclusion that Singleton's impairments, or a combination of her impairments, are not severe with substantial evidence —especially in light of the applicable *de minimis* standard. *See Bowen*, 482 U.S. at 153-54; *Johnson*, 922 F.2d at 347; 20 C.F.R. § 404.1522(a); SSR 96-3p.

In the end, both the ALJ and Commissioner were able to summon many reports of normal results related to Singleton's conditions bringing into question the severity of her impairments. However, Singleton has shown that the ALJ failed to consider the full scope of the examining physicians' opinions without sufficient explanation for favoring the non-examining Agency physicians' opinions, which were based on incomplete information. Accordingly, this case warrants remand to ensure complete consideration of the medical opinion evidence in the Step Two severity analysis.

## IV.   CONCLUSION

For the above reasons, this Court concludes that the ALJ's Step Two analysis was not supported with substantial evidence. Therefore, the Court now **REMANDS** this case for further proceedings consistent with this opinion. The Clerk is **DIRECTED** to terminate this case in favor of Singleton.

**SO ORDERED**

Dated this 4th day of April 2017.

s/Michael G. Gotsch, Sr.
Michael G. Gotsch, Sr.
United States Magistrate Judge
